No. 5421.

CHAFFRAIX & AGAR vs. JOHN B. LAFITTE & Co.

Where a non-resident commercial firm make an agreement with two resident firms, in virtue of which agreement one of the resident firms is to purchase certain merchandise, and ship it in the name of the other, and the other resident firm, with the money of the non-resident firm, is to pay for the merchandise, and each of the resident firms agree to receive, instead of fixed sums in payment of their services, certain proportions of the profits to arise from the subsequent sales of the merchandise, and also agree to share in any losses resulting from said sales,

*Held:* That such an agreement will not make the said firms commercial partners, even as to third persons, when it appears that they did not *intend* to form a partnership, and that they have not held themselves out to the world as partners.

APPEAL from the Sixth District Court, parish of Orleans. *Saucier, J.*

*Finney & Miller, Thomas Gilmore,* and *Kennedy & Austin* for plaintiffs and appellees.

*Carleton Hunt* for defendants and appellants.

The opinion of the court was delivered by

MARR, J. In November, 1872, an arrangement was concluded between Morton, Bliss & Co., bankers, of the city of New York, and two New Orleans firms, John B. Lafitte & Co., cotton buyers, and Price, Hine & Tupper, dealers in sugar and molasses, to this effect:

Price, Hine & Tupper were to buy molasses of a certain grade in their own name, to warehouse or ship it in the name of John B. Lafitte & Co., and to deliver the warehouse receipts or bills of lading to Lafitte & Co. On receipt of these commercial evidences of title and possession Lafitte & Co. were to pay Price, Hine & Tupper in cash, the cost of the molasses, and the expenses of the purchase; and Lafitte & Co. were to draw on Morton, Bliss & Co. for the money. Payments were to be made to Price, Hine & Tupper only on delivery of the warehouse receipts or bills of lading to Lafitte & Co.; and Lafitte & Co. were authorized to draw on Morton, Bliss & Co. only when the property was thus in the

possession of Lafitte & Co. for account of Morton, Bliss & Co. Price, Hine & Tupper were to make no charge for their services; but they were to receive one fourth, Lafitte & Co. one fourth, and Morton, Bliss & Co. one half of the profits; the losses to be shared in the same proportions. The names of Morton, Bliss & Co. and Lafitte & Co. were not to be used, and their connection with the business was not to be known, because the appearance of such heavy buyers in the market would have tended to enhance prices, and to diminish the profits of the adventure.

Price, Hine & Tupper made large purchases from time to time; and on delivering the warehouse receipts or bills of lading to Lafitte & Co., the cost and expenses of each purchase were promptly paid to them by Lafitte & Co. All the purchases were made by Price, Hine & Tupper for cash; but in some instances they obtained negotiable warehouse receipts, which enabled them to control and deliver the molasses, without having actually paid the price; and they finally failed, leaving a large amount unpaid, although they had delivered the evidences of title and possession to Lafitte & Co. and received the money from them.

Our predecessors decided, two of the judges dissenting, that there was no partnership between Price, Hine & Tupper and Morton, Bliss & Co.; and that Morton, Bliss & Co. were entitled to the molasses, which Chaffraix & Agar had seized under conservatory process *in limine* on the failure of Price, Hine & Tupper. A rehearing was granted by the same court; and, the case coming before us, we affirmed the decision without dissent. See the case, Chaffraix & Agar vs. Price, Hine & Tupper—Morton, Bliss & Co., intervenors—reported in 29 An. 176; to which we must refer for a more detailed statement of the facts.

In the present case the district court held that Lafitte & Co. were liable as partners, and condemned them to pay the amount due to Chaffraix & Agar for molasses sold to Price, Hine & Tupper; and we are called upon by this appeal to review that judgment.

The facts are the same, and the question is the same as in Chaffraix & Agar vs. Price, Hine & Tupper—Morton, Bliss & Co., intervenors—and we have the benefit of the printed arguments filed in that case, and the oral discussions and printed arguments in this case, which have been of the greatest service to us, and are of marked ability. We fully appreciate the importance of the case, and have endeavored to deal with it as *res nova*. If we have not arrived at a c rrect conclusion, the fault is not with the learned counsel on the one side or the other, who have arrayed all the authorities, foreign and domestic, which seem to support their respective theories. A review of them all would fill a volume; and we must content ourselves with the collation of such of them as seem to us determinative of the controversy.

As far as we have been able to discover, the foundation of the decision which has been accepted as authoritative and has controlled the jurisprudence of England and America for nearly a century, seems to be *dicta* of two of the judges in Grace vs. Smith, decided in 1775, reported in 2 W. Blackstone, 998. We have not been able to find this volume; and we state the case as it is reported in the arguments of counsel and the opinions of the judges in Coope vs. Eyre, 1 Hy. Blackstone 37, decided in 1788; and in Waugh vs. Carver, 2 Hy. Blackstone 235, decided in 1793.

Smith, a retiring partner, lent a sum of money to Robinson, the other partner, who continued in business, for which he was to receive five per cent interest, and an annuity of £300 for seven years, the whole secured by the bond of Robinson. Some years after this, Grace, a creditor of Robinson, brought suit to recover of Smith as a secret partner. The jury found for the defendant; and the court refused to grant a new trial.

Chief Justice DeGrey is reported to have said, we suppose on the motion for new trial: "The question is what constitutes a secret partner? . Every man who has a share of the profits ought also to bear his share of the loss; and if any one takes part of the profits he takes part of that fund on which the creditor of the trader relies for his payment. I think the true criterion is, to inquire whether Smith agreed to share the profits of the trade with Robinson, or whether he only relied on those profits as a fund for payment." And Blackstone, J., is reported to have said, on the same occasion: "The true criterion, where money is lent to a trader, is to consider whether the profit or premium is certain and defined, or casual and indefinite, and depending on the accidents of trade; in the former case it is a loan, in the latter a partnership."

It is upon this foundation alone that the celebrated decision in Waugh vs. Carver rests. The Carvers and Giesler, ship agents, had two distinct houses, the Carvers at Gosport, Giesler at Cowes. They agreed to assist each other in procuring agencies, and to divide the profits of a portion of the agency business. This was the only connection between them; and it was secret. A creditor of Giesler brought the suit to charge the Carvers and Giesler as partners. The remaining facts, and the decision, will be best stated in the language of Chief Justice Eyre, delivering the opinion of the court:

"It is plain, upon the construction of the agreement, if it be construed only between the Carvers and Giesler, THAT THEY WERE NOT, NOR EVER MEANT TO BE PARTNERS. They meant each house to carry on trade without risque of each other, and to be at their own loss. Though there was a certain degree of control at one house, it was without an idea that

either was to be involved in the consequences of the failure of the other, and without understanding themselves responsible for any circumstances that might happen to the loss of either. THAT WAS THE AGREEMENT BETWEEN THEMSELVES. But the question is, whether they have not, by parts of their agreement, constituted themselves partners in respect to other persons. The case therefore, is reduced to the single point, whether the Carvers did not entitle themselves, and did not mean to take a moiety of the profits of Giesler's house, generally and indefinitely, as they should arise, at certain times agreed upon for the settlement of their accounts. That they have so done is clear, upon the face of the agreement; and *upon the authority of Grace vs. Smith,* he who takes a moiety of all the profits indefinitely, *shall by operation of law, be liable for losses* if losses arise, upon the principle that by taking a part of the profits he takes from the creditors a part of the fund which is the proper security to them for the payment of their debts. *That was the foundation of the decision in Grace vs. Smith,* and I think it stands upon the fair ground of reason. * * * * If, therefore, the principle be true that he who takes the general profits of a partnership must of necessity be made liable for the losses, in order that he may stand in a just situation with regard to the creditors of the house, then 'this is a case clear of difficulty. *For though with respect to each other, these persons were not to be considered as partners,* yet they have made themselves such, with regard to their transactions with the rest of the world." 2 Hy. Blackstone, 246, 247.

As we have seen, there was no such question in Grace vs. Smith. The simple question was, whether a retiring partner, lending to the partner who continued in trade a sum of money in consideration of a certain annual interest, and an annuity for a term of years, was liable as a partner. It would seem that this was not a question of fact to be left to the jury, but a question of law to be decided by the court. The question would not have been different if no social relations had previously existed between Smith and Robinson; and the court in refusing a new trial necessarily decided that, upon the given state of facts, Smith was not liable as a partner. It is difficult to imagine what support this case gave to Waugh vs. Carver; and we think we are justified in saying, either that Chief Justice Eyre misapprehended and misapplied what was actually decided, or that the case is not correctly stated in any report to which we have had access.

In his examination before a select committee of the House of Commons in July, 1851, on the law of partnership, Mr. Fane exposed, in a masterly manner, the fallacy of the reasoning, and the utter want of foundation for the decision in Waugh vs. Carver. See report of this examination in note, Lindley on Partnership, Am. ed., 1860, p. 93. We do

not hesitate to say, that, in our opinion, Waugh vs. Carver could never have stood the test of judicial criticism; and that it was accepted and allowed to control subsequent jurisprudence, only because of an exaggerated respect for the doctrine of *stare decisis*.

Nevertheless, this decision was followed in England, and was so strictly adhered to that, as Mr. Lindley tells us, and he cites the cases to prove it: " Cruel as it may seem, it is established law, that if a person as executor or trustee employs money in any trade or business, and shares the profits arising from it, he thereby incurs all the liabilities of a partner, although he in fact has personally no interest whatever in the matter." Partnership, 91.

The judicial mind, however, in England and America, was not satisfied with this decision; and its absolute and arbitrary application to every case in which there was a participation in the profits of a business was found to be so unjust, in some cases *cruel*, as Mr. Lindley says, that the judges sought to escape from it, and took refuge in distinctions, which some very eminent men, of world-wide reputation, have characterized as "*very thin.*" Lord Eldon, in Hamper's case, 17 Ves. 404; Judge Story in Hazard vs. Hazard, 1 Story's Reports, 375; Sir Montague Smith in Mollwo's case, L. R. 4 Privy Council.

Thin and arbitrary as these distinctions were, they found ample justification in the equally arbitrary rule in Waugh vs. Carver; and at length they became as well established as exceptions to the rule as Waugh vs. Carver was as the general rule. Thus we find a class of cases of which Hamper's case, decided in 1811, Smith vs. Watson, 2 Barn. & Cress., 401, decided in 1824, may be mentioned as examples, in which the rule is recognized and enforced, that if. a trader agrees to pay another person, broker, clerk, agent, for his labor in the concern, " a sum of money, even in proportion to the profits, equal to a certain share, that will not make him a partner; *but if he has a specific interest in the profits themselves, as profits, he is a partner.* 17 Ves. 404. See, also, Dreg vs. Boswell, 1 Comp. 329; Wilkinson vs. Frazier, 4 Esp. 182; Mair vs. Glennie, 4 Maule & Selw. 240. Examples of American cases to the same effect are Muzzey vs. Whitney, 10 Johnson, 228; Loomis vs. Marshall, 12 Conn. 69; Hazard vs. Hazard, 1 Story 375; Denny vs. Cabot, 6 Met. 83; Vandenburg vs. Hull, 20 Wend. 70; Berthold vs. Goldsmith, 24 Howard 536; Seymour vs. Frees, 8 Wallace 202; Hallett vs. Desban, 14 An. 529, in all of which the employees were to receive a certain share of the profits; and they were held not to be partners because they had no proprietary interest in the property.

The arbitrary character of any such distinction is obvious when we remember that the foundation on which Waugh vs. Carver rests, the *ratio decidendi* that he who receives part of the profits is liable as a

partner, is that he takes from the creditors a part of that fund which is the proper security to them for the payment of their debts.

Dealing with these subtle, thin, arbitrary distinctions, which serve to show to what straits the judges were reduced, and the heroic efforts they made, taxing to the utmost their ingenuity and mental powers, to evade a rule which found no support in sound reason, which was wrong in principle, and unjust and oppressive in its application, but which they had not, shall we say it? the *nerve* to overrule and to declare not to be law, Judge Story, in his Treatise on Partnership, ₹ 36, says:

"As an original question, it might admit of very grave doubt whether it would not have been more convenient, and more conformable to true principles, as well as to public policy, to have held that no partnership should be deemed to exist at all, even as to third persons, unless such were the intention of the parties, or unless they had so held themselves out to the public."

And again, ₹ 49, this learned author says: "In short, the true rule, *ex æquo et bono*, would seem to be, that the agreement and intention of the parties themselves should govern all the cases. If they intended a partnership in the capital stock, or in the profits, or in both, then, that the same rule should apply in favor of third persons, even if the agreement were unknown to them. And, on the other hand, if no such partnership were intended between the parties, then, that there should be none as to third persons, unless where the parties had held themselves out as partners to the public, or their conduct operated as a fraud or deceit upon third persons. It is upon this foundation that the decisions rest which affirm the truth and correctness of the distinction already considered as a qualification of the more general doctrine contended for."

In our judgment it is not possible to lay down the rule which should govern in all such cases more clearly, or more in accordance with reason and common sense, equity and public policy. It affords ample protection against acts and conduct by which third persons may have been misled and deceived, while it renders due respect and homage to the meaning and intention of the parties, as expressed in their contracts and agreements; and it does not, like the rule in Waugh vs. Carver, ride rough-shod over actual contracts, and invent, and substitute for them, and enforce as contracts, new obligations to which the parties never consented, and which they never dreamed of contracting.

Reviewing the English jurisprudence on this subject, Mr. Lindley in his work on Partnership, side page 40, expresses the hope "that the rule which makes persons liable as partners simply because they share profits, will ere long cease to exist. The rule is in the highest degree arbitrary: it is grossly unjust; and it is productive of the greatest confusion."

What could be more unreasonable, more unjust, than, setting out/ with an agreement for a share of the profits, where it was plainly intended not to share the losses, to make liability for losses follow, as a necessary consequence, by mere operation of law, and thus to force upon the parties a partnership with all its consequences, contrary to their intention and agreement, and against which they vainly endeavored to protect themselves by the plain, unequivocal terms of a formal contract?

In Wilson vs. Whitehead, 10 Meeson and Welsby, Exchequer 502, three persons agreed to establish a review.   One of them was to be the publisher, and to make and receive general payments: another was to be the editor; and the other was to be the printer: the three to share the profits of the publication equally, after payment of all the expenses. The printer was to furnish the paper for the work, and charge it to the account at cost price; and he was also to charge the printing at master's prices.   He furnished accounts to the publisher, from time to time; but no settlement of accounts ever took place, nor were any profits ever realized from the work.

The suit was against the three, as partners, to recover the value of paper sold to the printer, who, it seems, carried on the business of printing generally.   Lord Abinger directed a nonsuit, with leave to the plaintiffs to move for a verdict for the amount sued for.   The rule was tried before Lord Abinger, Barons Parke, Gurney, and Rolfe; and they all concurred in the opinion that the defendants were not liable; that there was no proof of any authority to the printer to make the purchase for account of his co-defendants; and that he could, if he had chosen to do so, have used the paper for his own purposes, and not for the review.   This case was decided in 1842; and it seems wholly irreconcilable with Waugh vs. Carver.

In Cox vs. Hickman, 8 House of Lords Cases, 268, decided in 1860, the proprietors of iron works, becoming embarrassed, gave to trustees, by deed, power to carry on the works for the benefit of the creditors, who were to be paid ratably out of the income.   The suit was brought to hold the creditors, the beneficiaries, who were parties to the deed, liable as partners for a debt contracted in operating the works.   There was judgment for the plaintiffs; and the case was taken into the Exchequer Chamber, where the judges were equally divided.   It was afterward taken to the House of Lords; and the solemn judgment of that august tribunal, after the most elaborate discussion, was that the defendants were not partners, and that they were not liable.

In Bullen vs. Sharp, in the Exchequer Chamber, decided in 1865, L. R. 1 Common Pleas, 86, Sharp was about to commence business as an underwriter at Lloyd's.   His father guaranteed his liabilites to the

extent of £5000, in consideration of an annuity of £500, or ten per cent, which was to be increased in the event that the net average profits for three years should exceed £2000. The son failed; and the suit was on a policy of insurance, underwritten by him, to hold the father liable as a partner. The court considered Waugh vs. Carver as overruled by Cox vs. Hickman; and the judgment was that the father was not a partner and was not liable. Baron Bramwell, one of the judges, expressed the hope that the notion that he who takes a moiety of the profits indefinitely, shall, by operation of law, be liable for losses, is overruled; and he characterized the rule as one which " I believe has caused more injustice and mischief than any bad law in our books." P. 128.

In the same case, Justice Blackburn, who dissented in Cox vs. Hickman, delivered an elaborate opinion, in which he said: " I think the *ratio decidendi* is, that the proposition laid down in Waugh vs. Carver, viz., that a participation in the profits of a business does, of itself, constitute a partnership, is not a correct statement of the law of England." P. 112.

This was followed by Mollwo vs. the Court of Wards, L. R. 4 Privy Council, 419, decided in 1872, in which money was advanced to a commercial firm, and it was agreed that the creditor should have inspection of the books, and receive twenty per cent annually out of the profits. It was proven that he did not know much about commercial affairs; but that he had interfered, to some slight extent, in the business. In the course of a clear, forcible, learned opinion, upon which it was decided that this did not constitute a partnership, Sir Montague Smith said: " It appears established that, although a right to participate in the profits of trade is a strong test of partnership, and that there may be cases where, from such perception alone it may, as a presumption, not of law, but of fact, be assumed, yet, whether that relation does or does not exist, *must depend on the* REAL INTENTION AND CONTRACT *of the parties.* Cox vs. Hickman had certainly the effect of dissolving the rule of law which had been supposed to exist, and laid down principles of decision by which the determination of cases of this kind is made to depend, *not on arbitrary presumptions of law, but on the* REAL CONTRACTS AND RELATIONS *of the parties.*

And again, he said, p. 433, the rule that participation in the profits raises a presumption of partnership sufficient to establish it as regards third persons, is too artificial: " For, it takes one term only of the contract, and at once raises a presumption upon it, whereas, the whole scope of the agreement, and all its terms, ought to be looked at before a presumption of intention can properly be made at all. The rule in Waugh vs. Carver was eminently an arbitrary one; and subsequent discussion has led to the rejection of the reason for it as unsound."

The case of Tenant, decided in July, 1877, in the Supreme Court of Judicature in England, as cited by counsel for defendants, from the London Times, is like that of Bullen vs. Sharp, except that the father, who furnished the capital for his son was to have one half the net profits of the underwriting business, and £25 a year besides, to be paid to him by the son; and that the father claimed to be a partner, and sought as such, to have the assets of his bankrupt son applied to the payment of the debts of the business.

The court decided that there was not a partnership between the father and son; and Lord Justice Baggallay said: "Regard must be had to the whole of the terms of the contract between the parties, which, in the present case, showed that the father was not entitled to a share of the profits to be taken out of the assets of the business, but merely that a share of the profits was made a debt from the son to the father, just in the same way as the £25 was a debt."

We are quite ready to agree with the learned editor and annotator of a recent edition of Story on Partnership, and the equally distinguished author of some of our most valuable works on commercial law, both of whom have favored us with able arguments in behalf of plaintiffs in this case, that Waugh vs. Carver is no longer the rule; and that other tests must be resorted to in addition to participation in the profits, in order to determine the question of partnership *vel non*. Participation in the profits is one circumstance; participation in the losses is another. It is demonstrated that participation in the profits alone is not sufficient. The parties may stipulate for a participation in the profits, and that there shall be no partnership; and they may also agree to share profits and losses, and exclude partnership, since there is nothing in liability for losses, an incident of the contract of partnership, which gives it greater significance as a test of that relation than participation in profits, which is also an incident of that contract. Such agreements serve to fix the rights and relations of the parties with respect to each other; and the public, or third persons are not interested in or prejudiced by them, whether they are publicly avowed, or known only to the parties. The true, final, satisfactory, conclusive test is in the answer to the question: What was the real meaning and intention of the parties, as expressed in their contract, whether verbal or written? If they intended to create a partnership, they will be treated as partners *inter sese* and with respect to third persons: If they did not intend to create that relation, but merely to divide the profits, or to share profits and losses, in a speculation or adventure, they will not be partners *inter sese*, nor will they be liable as such. Those who hold themselves out to the public as partners, or knowingly permit themselves to be so held out, may not, indeed, be actually partners, if they have not so intended and agreed; but they

will be subject to the same liabilities as partners to those who have dealt and given credit on the faith and in consequence of such acts.

The secret partner, and the publicly avowed partner, are equally liable, are equally partners, because, in the one case and the other, it is the real intention and the contract which bind them; and the secret partner can escape liability only by the failure of the creditors to discover his true relation to the business.

We shall not attempt to analyze the American cases. Such of them as hold that he who shares in the profits, or in the profits and losses, is a partner, have simply followed Waugh vs. Carver, and the subsequent decisions which rest upon it, which were so long regarded as authoritative and controlling: while such as hold that one or both of these tests can not be accepted as conclusive proof of partnership rest upon distinctions equally as arbitrary as the rule in Waugh vs. Carver; and are supported by authorities of no less weight. It is to be hoped that the jurisprudence of the United States, like that of Great Britain under the recent decisions, will no longer depend upon arbitrary rules or arbitrary distinctions; but will accept the real intention and contract of the parties as the only safe and conclusive proof of their actual relations, whether *inter sese*, or as to third persons.

Those who have the leisure and the curiosity to trace the conflict in the English and American courts from Waugh vs. Carver down, have but to look into Gow, Collyer, Lindley, Story, Parsons, Troubat, any work on partnership, and read the cases cited in support of the harsh rule which ignored intention and contract, and the equally numerous cases by which it was palliated, by ingenious distinctions, until finally it was declared not to be the law of England, and the plain, natural, just, common-sense rule recognized, by which the real intentions and the contracts of parties are restored to that supremacy which they have always maintained in the civil law, and in the kindred systems which have sprung from that noble parentage.

It is elementary in our law, that there can exist no partnership without the consent of the parties, that is, without a contract establishing that relation. This was the rule of the Roman law. Papinian calls partnership *voluntarium consortium,* Dig. 17, tit. 2, 1. 52, § 8: and Ulpian says, id. l. 44: "Si margarita tibi vendenda dedero, ut, *si ea decem vendidisses, redderes mihi decem; si pluris quod excedit, tu haberes:* mihi videtur si animo contrahendæ societatis id actum sit, pro socio esse actionem; si minus præscriptis verbis." There was no inquiry as to whether a compensation was to be given, in proportion to the profits, equal to a certain share, or a specific interest in the profits themselves as profits. The sturdy Jurisconsult did not dally with artificial distinctions, resting on imaginary differences, but came squarely up to the question submit-

ted to him; and he solved it by a rule too plain to be misunderstood, an unerring guide, a perfect test, under all systems, in all ages, in all cases. If the parties intended to contract a partnership, "*si animo contrahendæ societatis*," then that will be their relation with respect to themselves, and to all persons whomsoever, even to the extent of controlling the form of the actions to which it may give rise. If that was not their intention, *si minus*, their agreement will not constitute a partnership, whether *inter sese*, or with respect to others. It may fall into that mass of contracts styled *innominate*, because not susceptible of distinctive classification, but not less obligatory on that account; and the litigations which may grow out of it must be in form *actiones in factum*, actions on the case, so-called " *quia nomen non possumus invenire*," which were as well known and as useful in the Roman tribunals as they are now in Westminster Hall. Dig. 19, title 5, l. 1.

In France, "La société procède toujours d'un contrat. Sans convention, point de société. Troplong, Société, 1, p. 9, No. 3.

The word partnership is used in our Code to designate the contract by which that relation is created, and to signify the relation which is created by the contract. The Revised Civil Code of 1870, art. 2801, Code of 1825, art. 2772, treats of the contract; and it declares that " partnership is a synallagmatic contract."

Art. 2805, R. C. C., art. 2776 of the Code of 1825, treats of the relation; and it declares that "Partnership must be created by the consent of the parties."

Article 2807, 2778 of the Code of 1825, also treats of the relation: " A community of property does not, of itself, create a partnership, however that property may be acquired." And in Pickerell vs. Fish, 11 An. 278, this court said: " A partnership is formed upon the voluntary consent of the parties, as contradistinguished from the relations which may arise between them by the mere operation of law, independent of such contract."

The law may, and it does, impose liability as a necessary consequence of the acts and conduct of parties; but it can not form the contract or create the relation which it calls partnership.

Article 2825, art. 2796 of the Code of 1825, has been relied upon sometimes to show that the relation of partnership exists from the nature of the trade or business in which the parties engage; but it has no such effect or scope.

Section 1, of chapter 2, title xi., treats of " the division of partnerships." Article 2824 declares that partnerships, according to their objects, are either commercial or ordinary; and article 2825 declares that commercial partnerships are such as are formed—

41

"First—For the purchase of any personal property, and the sale thereof, either in the same state or changed by manufacture," etc.

That is, where the relation has been created by the contract, the voluntary consent of the parties, articles 2825, 2826, enable us to determine whether it is a commercial partnership or an ordinary partnership by reference to the objects for which it has been formed; but these articles are of no value in determining whether the contract has been formed and the relation established.

Our predecessors decided in Hallett vs. Desban, 14 An. 529, that a clerk who received part of the profits as compensation for his services was not a partner, because he had no proprietary interest; in Belden vs. Reed, 27 An. 103, they decided that a consignment of goods for sale, under an agreement that the consignor should take back such of them as were not sold, at cost and a small percentage, and that the profits and losses should be divided equally between consignor and consignees, did not constitute a partnership, because the consignees had no proprietary interest in the goods; and in Edwards vs. Fairbanks, 27 An. 452, they decided that refiners receiving two thirds of the profits on sugars as compensation for the refining, were not partners, for the same reason.

It would not be profitable to pursue this subject further. We find in this record no evidence of any act on the part of Lafitte & Co. which authorized plaintiffs or any other person who sold molasses to Price, Hine & Tupper, to suppose that Lafitte & Co. had any connection with or liability for these purchases. Price, Hine & Tupper were general dealers in sugar and molasses, and all of their purchases were not for account of Morton, Bliss & Co. The agreement was that Morton, Bliss & Co., through Lafitte & Co., would take and pay for such molasses, of the grade agreed upon, as Price, Hine & Tupper might buy and place in the possession and under the control of Lafitte & Co.; and if plaintiffs allowed Price, Hine & Tupper to make delivery to Lafitte & Co. of molasses for which Price, Hine & Tupper had not paid, the fault was with them, and with them alone.

Price, Hine & Tupper had no proprietary interest in the molasses after they had delivered to Lafitte & Co. the receipts and bills of lading and received the price according to the agreement; and Lafitte & Co. had no proprietary interest, but held merely as agents for Morton, Bliss & Co. The whole proceeds went into the hands of Morton, Bliss & Co. without any power of control on the part of Price, Hine & Tupper or Lafitte & Co.; and if profits had been realized, Morton, Bliss & Co. would have been the debtors of Price, Hine & Tupper and of Lafitte & Co. each for one fourth of the profits, when all of the molasses was sold, and the profits ascertained, the stipulated compensation for their services respectively. There was no partnership between these several

firms, because there was no contract by which that relation was created; and Lafitte & Co. are not liable for the default, or the acts or omissions of Price, Hine & Tupper, because they did nothing with respect to the dealing of Price, Hine & Tupper to mislead or deceive plaintiffs or any person whomsoever.

It is therefore ordered, adjudged, and decreed that the judgment of the district court appealed from be annulled, avoided, and reversed; and that the demand of plaintiffs be rejected, and their suit dismissed with costs in both courts.

## DISSENTING OPINION.

EGAN, J. No field of inquiry in the law has been more vexed, and in none have the decisions of courts generally been more irreconcilable than as to what constitutes partnership and when responsibility as partners is incurred. The present case, and the array of learning and authority on both sides afford an apt illustration of this fact. It is both wise and well to borrow light from the enlightened and progressive jurisprudence of other States and countries when our own law is silent, or the jurisprudence of our own State either unformed or uncertain. We are, however, not at liberty to do so where neither is the case if such reference should lead to conclusions antagonistic to the doctrines settled by our own law and announced by our own courts. Unlike Great Britain especially, we have a codal definition both of partnership in general and of commercial partnership in particular. The former is a contract between two or more persons for the mutual participation in the profits which may accrue from property, credit, skill, or industry furnished in determined proportions by the parties. C. C. 2801. The latter is formed, first, for the purchase of *any personal property*, and the sale thereof, either in the same state or changed by manufacture; second, for buying or selling any personal property whatever, as factors or brokers; third, for carrying personal property for hire in ships and other vessels. C. C. 2825. When the conditions exist which are embraced within any of these definitions, partnership results from the very terms of the law, though nothing further be said, and no matter whether the parties so understood or intended or not. A sale is none the less a sale where all the elements necessary to constitute it exist whatever the parties may call it; and so it has often been decided. The same is true of partnership of whatever class. We are told, however, that in the present case, although the several parties agreed together in advance for the purchase and sale of personal property, sugar and molasses, and although they agreed for the mutual participation in the profits in determined proportions, that it is not a partnership, but a commercial adventure or joint

account, like the *Association en Participation* of France. In other words, that although all the conditions of a commercial partnership under our law exist, it is not a partnership because some of the parties or all, if you will, did not at the time intend to so constitute it, although nothing was said about their intention at the time beyond that to enter upon the common venture for the common profit. That the parties anticipating profits agreed and are entitled to share in them but not in the losses or liabilities incurred in carrying out the venture. It so happens, however, that we are not left at sea and need not go abroad to ascertain the consequences of such an understanding or agreement. Our own Code, article 2813, provides that "a participation in the profits of a partnership carries with it a liability to contribute between the parties to the expenses and losses;" and the next article, 2814, that a *stipulation* that one of the contracting parties shall participate in the profits of a partnership but shall not contribute to losses is void, both as it regards the partners and third persons. It surely will not now be seriously argued that because the plaintiffs were not aware at the time of the sale that the defendants were interested in the purchase and expected to share in the profits they are not liable. Such is not the doctrine either of our own or of any other system of law. Upon that subject there is no difference of opinion among the standard authors of this or any other enlightened country, or in the decisions of enlightened courts anywhere. The undiscovered partner is held liable when discovered everywhere.

It is undisputed that the several parties agreed together for the purchase and sale of sugars and molasses of a certain grade in advance, and that the purchase made from the plaintiffs was in pursuance of that agreement *and so treated by all the parties.* Nor is there any dispute of the fact that although the sugar and molasses purchased from plaintiffs were received and used in accordance with that agreement, the plaintiffs have not been paid for them. It is immaterial whether according to the contemplation of the parties as shown in the original letter from the defendants to Morton, Bliss & Co., Price, Hine & Tupper were to furnish a part of the money for the common venture, or whether, as stated by Mr. Lafitte, that was afterward changed and Morton, Bliss & Co. were to furnish the whole of the money for the contemplated purchases, and Price, Hine & Tupper only their skill and services in selecting and buying the merchandise. Indeed, if any thing, the latter view would militate most strongly against the defendants, for the reason that it puts entirely out of view the idea that more than one purchase or sale was contemplated (i. e.) the one with the money furnished for the purpose by Morton, Bliss & Co., who, as well as the defendants, are thus brought into direct connection with the purchase by Price, Hine & Tupper from

Chaffraix & Agar vs. Lafitte & Co.

the plaintiffs, and with the latter themselves. So that there is not even the intervention of a middle man at all, for it is not pretended that Price, Hine & Tupper were brokers or acted as such in this instance; and if it were so pretended, there is nothing in the record to sustain it. As we understand it, Morton, Bliss & Co. were to advance the money, John B. Lafitte & Co. to hand it over to Price, Hine & Tupper, upon the receipt from them of the warehouse receipts which it is well known, according to the custom of trade, are always passed when the contract of sale is agreed on, subject to the right of reclamation or enforcement of privilege within the time fixed by the statute in regard to the sale of agricultural products if not paid for; and that Price, Hine & Tupper were to select the sugars and molasses and go into the market to make the purchases, they being experienced dealers; while after the sale the three firms were to share in the profits in proportions defined in their contract; and as Mr. Lafitte says, to " *share in the losses*," also. Nothing more is wanting than this latter admission to do away with any possible idea, which, however, there is nothing else to support, that Price, Hine & Tupper were either brokers or agents in this transaction; for we venture to assert that nowhere, under any system, has a mere broker or agent been held responsible for losses. Still less can it be said that Price, Hine & Tupper could be held liable for losses if they were vendors; and, indeed, there is nothing in the record to support the theory that there was any agreement even for a sale from the latter either to Morton, Bliss & Co., or to them and Lafitte & Co.; still less that there was any fixed price in money agreed on as between them and Price, Hine & Tupper, but only that the price agreed on between the plaintiffs and Price, Hine & Tupper was handed to them to be paid to the vendor, and that they did not do so.

It is not necessary at this late day to assert anew the well-established principle that a failure of one partner (if there be a partnership) to apply to the payment for goods purchased moneys entrusted to him by his copartner for that purpose, can not relieve the latter from after liability for the price. Nor is it necessary to consider at any length the provisions of our law regulating the rights and responsibilities of partners in commendam, since it is not even pretended that the defendants or any one else engaged in this venture were such partners. The position of defendants is that they were not partners at all, and no such stipulative writing or registry for the information of the public as is required in this modified partnership is any where shown in this record, while, on the contrary, it is shown that all the parties to this venture were active participants in its management at some stage. If, then there was in this case neither agency nor resale nor partnership in commendam the conclusion is inevitable that it was a partnership, and the

consequence of liability of the defendants as partners and as commercial partners at that must attach. Once a commercial partnership is shown to exist, our law recognizes a modification or limitation of the liability of the partners in but one mode, and that is provided in the articles of our Code in regard to partnership in commendam. See C. C. articles 2839—2851. And once partnership is shown, liability as partners follows by all authority and under any system of law, here or elsewhere. We think an examination of the authorities relied upon by the defendants' counsel demonstrates this as fully as those cited by the plaintiffs' counsel, and Mr. Parsons, an eminent American writer to whom both have freely appealed, recognizes the fact that such is the general law, and that any modification of the consequences of partnership anywhere is the result of statutory provision, as we have. All that is pretended here is that such agreements and ventures as that which led to the suit at bar do not create a partnership, but only something called in common parlance a commercial adventure on joint account, by embarking in which, though it involves and is designed for the purchase and sale of personal property for the joint profit and advantage, in definite proportions, of all concerned, and that although liable as between themselves for any losses which may result from the venture, those engaged in it are not liable as partners to those from whom is purchased the property from the resale of which the expected profit is to be derived. Whatever may be the case elsewhere, no provision is made under our law for such adventures as exceptions from commercial partnerships, and the consequent liability of those concerned. It may be said that this is a narrow view, at war with the general usage of the commercial world elsewhere. If this be so, the remedy is not with us but with another—the legislative department of the government—whose province alone it is to bring the law of Louisiana on this subject in harmony with that which it is asserted prevails elsewhere. In this connection it may be remarked, however, that even under the " *Association en Participation* " of France, none of the parties could absorb to himself the object of the common venture to the prejudice of creditors and to that extent at least that he would have to account and pay over, while under our own law the partner in commendam can not withdraw the stock he has furnished if his partners are in failing circumstances or there is reason to apprehend their insolvency or that of the firm, C. C. article 2851; but the whole sum furnished is liable for the debts of the partnership, C. C. 2841; and that none of the cases relied upon by the defense and by a majority of the court present the same state of facts, especially with reference to joint liability for losses incurred, with that at bar.

Under the testimony in this case it will not be pretended that had the sugars and molasses bought from plaintiffs been lost or destroyed

subsequent to their purchase for joint account, whether before or·after the delivery by Price, Hine & ·Tupper to the defendants of the warehouse receipts, that both they and Morton, Bliss & Co. would have been compelled under their agreement, as stated by the defendant Lafitte himself, to share the loss with Price, Hine & Tupper, and *vice versa*, and the express provision of our own Code, article 2864, "that a partner may be a creditor of the partnership not only for the sums which he has disbursed, but likewise for the obligations he has entered into *bona fide* for the partnership and for losses reasonably incurred in his administration," is in strict accord with the agreement of the parties here.

The decisions of the courts of Louisiana have been so fully reviewed in the dissenting opinion of Mr. Justice Spencer, in which I concur, that it is unnecessary for me to say more in regard to them. They are in support of the views expressed in this opinion. Our law makes ample provision for legitimate profits or the opportunity to earn them by all who may choose to employ their capital, skill, or industry in the purchase and sale of our agricultural products or other personal property in open market and in open competition. I am at a loss to see the equities as against vendors who have not received the price in favor of those who have annulled their own connection with or interest in the purchase· in order, as admitted here, to depress the price of any commodity or sale simply because those to whom they have entrusted the money to be used in the common venture with themselves have not so applied it. However widely established may be such a commercial usage, here or elsewhere, it·can not, in my opinion, be practiced without carrying with it as to the undisclosed parties in interest all the liabilities which attach to secret partners any where. I yielded a reluctant assent to the decision in Chaffraix & Agar vs. Price, Hine & Tupper, reported in 29 Annual, out of deference to what seemed to me then the weight of authority and to the views of my associates. Further argument, examination, and reflection have convinced me that my reluctance then was with good reason, and that that decision in that case was erroneous.

For these reasons I dissent from the conclusions of the majority of the court in this case as well as those between other parties resting upon the same principles this day announced.

---

### DISSENTING OPINION.

SPENCER, J. The facts of this case are identical with those of " Chaffraix & Agar vs. Price, Hine & Tupper—Morton, Bliss & Co., Intervenors"—reported in 29 An. p.·176. It is unnecessary to repeat them here. In that case plaintiffs sought to hold Morton, Bliss & Co. liable as princi-

pals or partners of Price, Hine & Tupper. In this they seek to hold John B. Lafitte & Co. in the same manner.

These cases have been contested with marked ability, learning, and research. The best legal talent of our State, as well as eminent foreign counsel, have engaged in their discussion.

The sole question is, what was the nature of the contract between the three firms of Price, Hine & Tupper, Morton, Bliss & Co., and John B. Lafitte & Co., and what rights and obligations did it engender as between themselves and as to third persons? If Price, Hine & Tupper were merely the employees of the other two firms, and were furnished by the latter with money to buy the molasses, receiving a share of the profits *as compensation*—or, if Morton, Bliss & Co. and Lafitte & Co. were simply undisclosed and unknown principals, to whom plaintiffs gave no credit, and of whom they had no knowledge, then I do not hesitate to say that, after these principals have, *in good faith*, paid over the money due to Price, Hine & Tupper as re-imbursement of sums advanced or supposed to have been advanced by them, plaintiffs can not maintain an action against said principals for the price of goods sold to the employees. If I hand to my clerk a sum of money and direct him to buy for cash a certain article, and he squander the money and buy it on his own credit, from one *who did not know him to be my clerk*, to my mind it requires no authority beyond common sense and fairness to show that the vendor can not recover the price from me. This eminently fair and common-sense view is also that of the best considered authorities. See Armstrong vs. Stokes, L. R. 7, Q. B. 598.

If Price, Hine & Tupper were mere employees, receiving a share of the profits as compensation for their services, there was no partnership between them and their employers. See Hallett vs. Desban, 14 An. 529.

But were they mere employees? That was the view I took in the case, as against Morton, Bliss & Co. Further consideration and discussion have changed my opinions upon the subject.

The salient fact, which in my opinion, demonstrates that they were not mere employees in the transactions out of which this litigation arises, is *that they were liable for losses.* An agent or employee, acting within the scope of his authority, and purchasing for another, can not, in the nature of things, be liable for losses suffered by his principal, beyond such part of anticipated profits as might be due him as compensation. It seems, indeed is broadly admitted, that under the agreement between these three firms, any losses sustained in this venture, were to be borne by the parties in the same proportion that the profits were to be divided, *i. e.* one half by Morton, Bliss & Co., one fourth by Lafitte & Co., and one fourth by Price, Hine & Tupper.

It would seem to be a corollary of this liability for losses, that P., H.

& T. were bound by any contracts or obligations which Morton, Bliss & Co. or Lafitte & Co. might enter into with reference to the molasses. Thus if Morton, Bliss & Co. had incurred a debt of $20,000 for the transportation, storage, or salvage of the goods, Price, Hine & Tupper would have been liable, *at least and certainly* to the extent of one fourth; for to that amount even Morton, Bliss & Co. could recover against them. I do not see how they could avoid liability on such demand, by pleading, as defendants' counsel does, that the molasses was the property of Morton, Bliss & Co. The answer to this would be, that by the terms of your contract with Morton, Bliss & Co. you bound yourselves for losses, and our claims are chargeable to that account.

Again, it seems to me, that by this agreement to pay losses, Price, Hine & Tupper (supposing them to be solvent) had involved in this transaction, *proportionably*, the same thing as Morton, Bliss & Co. It can not be disputed that, even *inter se*, as between the three firms themselves, Price, Hine & Tupper risked in this venture one fourth of *the entire cost* of the molasses, *plus* one fourth of *all expenses*. If by deterioration or other accident the molasses lost all or part of its value, it was their loss, just as much so, *proportionably*, as it was that of Morton, Bliss & Co. If they had been participants in the profits and losses to the extent of *one half instead of one fourth* their interest in this venture would have been *both in nature and amount identical with that* of Morton, Bliss & Co. Are such *equality* and *identity* of risk and interest characteristics of the relation of principal and agent, of employer and employee? It is elementary that these are not *indicia* or consequences of the contract of mandate. Under the facts of this case, I see no more reason to say that Price, Hine & Tupper were agents or employees of Morton, Bliss & Co. than that Morton, Bliss & Co. were employees of Price, Hine & Tupper. True, Morton, Bliss & Co. agreed to bear *half the losses*, in consideration of receiving *half the profits;* but it is equally true that Price, Hine & Tupper agreed to bear *one fourth* the losses in consideration of receiving *one fourth* the profits. In what respect did the nature and character of their interest and risk differ? We can not distinguish between them, on account of the fact that, by the agreement, Price, Hine & Tupper were to devote themselves exclusively to the selection and purchase of the goods—Lafitte & Co. to receiving and forwarding them and disbursing the money, and Morton, Bliss & Co. to the advancing of the capital, and selling of the goods. These facts have no significance. Such divisions of labor, power, and responsibility are too frequent among persons associated in business to afford ground for distinguishing this case from others. I see no escape from the conclusion that Price, Hine & Tupper were principals in this association, as much so as either of the other firms—having proportionably the same stake

in the adventure, the same interest in its results, whether profit or loss. Nor do I perceive how it can be said that, after the molasses passed into the hands of Lafitte & Co. Price, Hine & Tupper had no interest in it. We have seen that, had this property been lost, or been absorbed by expenses and charges, Price, Hine & Tupper would have borne *one fourth the loss*, just as Morton, Bliss & Co. and Lafitte & Co. would have borne, between them, the *other three fourths*. Where a man is not a guarantor or underwriter, how can it be said that he has no interest in a thing when its destruction is his loss? It seems to me that they were joint owners of this property. And why not? Did the mere fact that Morton, Bliss & Co. or Lafitte & Co. *under an agreement so to do,* furnished the money to buy goods for joint account and risk of themselves and another exclude that other from a joint ownership in the thing so bought? Or does the fact that by the agreement of these parties the thing so bought was to be immediately placed in the name, care, and disposal of one of the associates repel or exclude the idea of joint interest therein? To my mind this was at most a mere precaution, and is no sufficient evidence of exclusive ownership in Morton, Bliss & Co. or Lafitte & Co.

My convictions in this regard are strengthened by the further consideration that the facts of this case repel the idea that there were two sales, one from Chaffraix & Agar to Price, Hine & Tupper, and another from the latter to Lafitte & Co. or Morton, Bliss & Co. The property never stood for a moment in the separate name of Price, Hine & Tupper. The delivery, by transfer on the books of the warehouse, was direct from Chaffraix & Agar to Lafitte & Co. Besides, as between Price, Hine & Tupper and their associates, the transaction lacked one indispensable element of a sale, to wit: a " fixed and determined price." " The price" says Civil Code, art. 2439, "*must be certain,* that is to say, *fixed and determined by the parties."* Here there was no price " fixed and determined." A vendor, in the nature of things, can not be held liable as such for losses suffered by the purchaser on resale of the thing bought, or for deteriorations proceeding from accidental and subsequent causes. It is inconsistent with the nature of the contract of sale. In this case nobody knew or could know what Price, Hine & Tupper were to get. It depended upon the fluctuations of the market and the hazard of circumstances. The sums which they received from Lafitte & Co. were not *the price of a sale.* They were re-imbursements, *according to agreement,* of sums paid or supposed to have been paid, for account and in furtherance of the common enterprise.

We find, therefore, that Price, Hine & Tupper were neither vendors of the molasses nor mere agents in its purchase, but on the contrary, that they were principals, equals and associates of Morton, Bliss & Co.

and Lafitte & Co. in an association whose purpose and object were the purchase and sale of molasses for a limited period, the profits and losses to be divided and borne in stated proportions, each member of the association having assigned to it distinct duties to perform, having a joint common interest of *precisely the same nature* and *differing only in amount.*

What, then, was the relation existing between these firms, according to the laws and jurisprudence of Louisiana? For if these afford us a clear and satisfactory answer we are not at liberty to go further; and need not perplex ourselves more, in the vain effort to reconcile the conflicting jurisprudence of other States and countries.

I say advisedly we are not at liberty to go outside of our own law if it affords a solution. It should be borne in mind that the dispositions of the Code of 1808 (p. 400, art. 61), which expressly subordinated its provisions " to the laws and usages of commerce," as also those of the Code of 1825 (arts. 2823 and 2798), which make reference to a " commercial code" as paramount in matters of commercial partnership, have been expunged from and find no place in the Code of 1870. We are therefore no longer at liberty to subordinate the provisions of the Civil Code "to the laws and usages of commerce." These "laws and usages" are rules of decision for us now only when and to the extent that the Civil Code is silent.

The provisions of our Code pertinent to this question of partnership are as follows:

Civil Code, art. 2801. "Partnership is a synallagmatic and commutative contract made between two or more persons for the mutual participation in the profits which may accrue from property, credit, skill, or industry, furnished in determined proportions by the parties."

Article 28( 9. "Property, credit, skill, and industry being the sources from which the profits of a partnership may be drawn, each of the partners may furnish either or all of these in such proportions as they may mutually agree."

Article 2813. " A participation in the profits of a partnership carries with it a liability to contribute between the parties to the expenses and losses. But the proportion, like that of the profits, may be regulated by the stipulation of the parties, and, where they make none, is provided for by law."

Article 2814. "A stipulation that one of the contracting parties shall participate in the profits of the partnership but shall not contribute to losses is void, both as it regards the partners and third persons. But in the case of a partnership in commendam, hereinafter provided for, the liability to loss may be limited to the amount of the stock furnished."

Article 2825. "Commercial partnerships are such as are formed:

"1. For the purchase of any personal property, and the sale thereof, either in the same state or changed by manufacture."

"2. For buying or selling any personal property whatever, as factors or brokers."

"3. For carrying personal property for hire, in ships or other vessels."

Article 2852. "All the provisions of this title are also applicable to commercial partnership, except as otherwise provided for."

Article 2827. "Commercial partnerships are divided into two kinds, *general and special*."

In order to constitute a commercial partnership therefore, under our Code, there must be an agreement between two or more persons acting as principals, whereby they are to furnish respectively either property, credit, skill, or industry, or all of these, in determined proportions, for the purpose of buying or selling personal property for their own account or as brokers or factors, or for the purpose of carrying persons or property for hire in ships or other vessels, for their mutual profit or loss in such proportions as the agreement or the law determines.

It will be seen that liability for losses is an element *always and necessarily* present in a partnership, and *never* in the contract of agency. Let us apply the test of these rules to the instant case.

There was an agreement between these three firms as equals and principals, whereby Morton, Bliss & Co. agreed to furnish the money, and Lafitte & Co. to disburse it, and to receive and forward the goods which Price, Hine & Tupper were to select and purchase, for the purpose of reselling them for joint account of the parties, the profits and losses resulting to be borne in stated proportions. We find that the nature of the interest and risk of these several firms in this venture is the same, each embarking and staking, if need be, its whole fortune to make good losses resulting from it.

There is present here every element necessary to constitute those three firms special commercial partners.

Although I think there was a joint ownership of the three firms in the molasses, I do not regard that as a material question. It matters not whether they were partners in the profits and losses only, or in the capital also. I know no law that prevents a partner, as between himself and copartner, retaining the ownership of what he "furnishes" as capital, if he so stipulates. The Code simply says he "furnishes" property, credit, etc. This does not necessarily imply that he must transfer the ownership of such property to the firm. He may limit the right of the firm to the use of the property he "furnishes," but he is neverthe-

less a partner. Besides, it is well settled that joint ownership in the capital is not of the essence of the contract of partnership. See Story on Partnership, sec. 27; R. C. C. 2829.

If we turn now from the Code to the decisions of our own courts I think we will find them in entire harmony with the foregoing views.

In McDonald vs. Millaudon, 5 L. 403, the defendant was held liable as a partner under the following facts: He advanced $20,000 to the firm of W. & D. Flower, and stipulated that he was to receive ten per cent interest on his advance and one third the profits. He contended just as is done in this case, that *there was no consent or agreement on his part to become a partner*, that his name was not used or known in the firm, and that there was not under our law any such thing *as an implied partnership*. But the court held otherwise and said: " The Supreme Court of the United States has lately declared the rule to be perfectly settled, that a party who shares in the profits, although his name be not in the firm, is responsible for its debts. In the present case, the defendant contracted for these profits, and received them." 5 Peters, 561.

So in Purdy vs. Hood, 5 N. S. 626, the court said: " But when personal property is acquired *jointly by two or more persons*, for the express purpose of being sold on joint account with a view to gain, it appears to us that a partnership is created in relation thereto, and that the rights and claims of the parties must be regulated agreeably to rules appertaining to such contracts."

The case of Robertson vs. Lizardi, 4 R. 300, discloses the following facts : McKenzie & Co. and Lizardi & Co. agreed to make on joint account certain cotton speculations. McKenzie & Co. were to buy the cotton in their own name in Mobile, with funds raised on bills drawn by them upon Lizardi & Co. of Liverpool, and the cotton was to be shipped to and sold by Lizardi & Co. in Liverpool for joint account. The question was whether the two firms were partners. The court said :

" The parties certainly contemplated a participation in the profits of the cotton trade during the season, and that is sufficient to constitute them partners, as to third persons dealing with them, or either of them, in relation to that branch of trade. Story on Partnership, sections 55, 103; 3 Kent's Commentaries (1st edition), page 17.

" It is, however, contended by the counsel for the defendants, that the parties never contemplated a general partnership; and he infers this from their having assumed no social name, from there being no capital provided, no partnership books opened, no provision made for expenses, and because no such thing is named in their correspondence. Let it be admitted that all this is true, and that there was not between the defendants and McKenzie & Co. a regular formal and general partnership; yet the moment it is shown that, *for a limited period*, and in relation to

*a particular branch of commerce*, they were *to buy and sell on joint account* and participate *in the profits*, they became thereby as to third persons partners in relation to that trade. There may be cases in which, in point of fact, the parties are not partners *inter se*, and yet are held liable, as such, toward third persons dealing with one of them. This was the doctrine recognized by this court in the case of McDonald vs. Millaudon, 5 La. 409."

In Boudreaux vs. Martinez, 25 An. 167, it was said: "The liability of secret or dormant partners in commercial partnership in all cases like the present is so well established and so universally recognized that authorities need scarcely be referred to. In the case of a dormant or secret partner the credit is manifestly given only to the ostensible partner, for no other party is known. Still, however, it is not treated as an exclusive credit, for the law in all cases of this sort founds its decision upon the ground that the creditor has had a choice or election of his debtor, which can not be where the partner is dormant or unknown."

In Jenkins vs. Howard, 21 An. 597, the court says: "A single adventure of the character of that made by these parties, a commercial operation, where the purpose is to buy and afterward sell the commodity for profit, constitutes the parties commercial partners, and creates a commercial partnership, *quoad* the single transaction."

In Cooley vs. Broad, 29 An. 345, this court said in reference to a clause in the contract declaring *that it was not a partnership:* "When there exist all the conditions which by law create a legal relation, the effects flowing from such relation will follow whether the parties foresaw and intended them or not. * * * The fact that the parties had made stipulations between themselves as to their liability for each other's debts, or as to the proportion of their several responsibilities, can not affect third persons," etc. In other words, we then held that if the parties have agreed to do certain things, and the doing of those things is made by law a partnership, it matters not whether the parties call themselves partners or not, nor whether they intended to be such or not. We must regard things, not names.

In Case vs. Beauregard, 1 Otto 134, the Supreme Court of the United States use this language, interpreting the Code of Louisiana: "There was in this agreement all the essential conditions for the creation of a partnership—provisions for a union of services and money, and a division of profits and losses. The postponement of a division of profits between the three partners until the capital advanced by two of them should be refunded, with interest, did not alter the character of the agreement as one of partnership, nor the liability of all the partners to third persons for debts contracted in the prosecution of its business. It was sufficient to create the partnership relation that profits to be ulti-

·mately divided between the parties were contemplated from their joint enterprise. Civil Code of 1870, art. 2811."

I will only add to this list of our own authorities, expounding our own law, what Mr. Lindley says in his work on Partnership, 3d edition, page 19.

"An agreement to share profits and losses may be said to be *the type* of a partnership contract. *Whatever differences of opinion there may be as to other matters, it admits of no doubt whatever that persons engaged in any trade, business, or adventure, upon the terms of sharing profits and losses arising therefrom, are partners in that trade, business, or adventure.*"

While there are many adjudged cases cited by defendant from the decisions of other States and countries which militate more or less against these views of Lindley, I do not think any well-considered case to the contrary of the doctrine announced by him can be found in our own reports. I do not think that Edwards vs. Fairbanks and Gilman, 27 An. 449, or Belden vs. Read, 27 An. 103, go to the extent claimed by defendant. But if they do, the weight of authority is greatly against them.

There is so much conflict and discordance among the decisions of the courts of our sister States and foreign countries that it would be idle to review them, and impossible. I think, to reconcile them. I feel constrained to follow the beaten track of our own jurisprudence on this subject, which, in my opinion, is uniform and consistent, to the effect that where two or more persons agree to combine their property, credit, skill, or industry, for the purpose of buying and selling personal property, and of dividing the profits and loss thereof among themselves as principals, there exists between them a commercial partnership, which may be "general" or "special" according to the scope or duration of its operations.

The fact that one or more of the persons so combining and associating themselves are unknown to the public, and that credit in any particular transaction is extended *in fact* only to the ostensible and known operator, makes no sort of difference as to the liability of his unknown associates. The sole question is, *were they partners?* not whether they *were known as such.* Surely at this day nobody will or can dispute the liability of a secret partner. It is elementary, and citation of authority would be "carrying coals to Newcastle."

Our Code declares that commercial partners are liable *in solido.* It ·does not distinguish between a "general" and "special" partnership, in thus fixing the liability of the partners. If the debt was contracted in the course of the common business, each partner is bound for the whole.

Nor is this liability lessened or varied by any secret or private agree-
ments between the partners as to the power or right of any one of them
to contract debts or create obligations. The moment they became part-
ners the law declares them bound toward third persons for the acts of
each other relative to the common business. The fact therefore that
Price, Hine & Tupper were forbidden to use the name of either of the
other associated firms has no significance if the three firms were in law
partners.

So far as the equities are concerned, I do not think they are so pro-
nounced on either side as to constitute an important element of decision
in the case. Defendants trusted their money and plaintiffs perhaps
trusted their goods to Price, Hine & Tupper, who squandered the former
and did not pay for the latter. But it may be asked what principle of
equity, under this state of facts, would allow defendants to take plain-
tiffs' goods in order to make good their loss which their own associate
caused them by misuse of their money? I confess that I can see no
superior equity in defendants' claims over those of plaintiffs. I am not
sure but that equity as well as the law is with the plaintiffs.

Under our Code, if the purchaser do not pay the price, the vendor
may resolve the sale and claim back the thing. C. C. 2539, 2041. This
right of resolution is not confined *by our Code* to sales of *any particular
kinds of property*. The doctrine of the French law, as to the *instant
prescription* of movables by a purchaser *in good faith* is not found in
our Code. So far as I can find this right of resolution is not defeated
by subsequent alienations. Marcadé, vol. 4, page 489, vol. 6, pp. 289 and
290. It rests upon that broad principle of law and equity, that in all
commutative contracts what is given or promised by one party is not
only *the cause of* but *a condition to* what is given or promised by the
other party. Plaintiffs, therefore, in law and equity, had a right to take
back their property not paid for, the possession of which had, as I think
the evidence discloses, been fraudulently taken from them, not by Mor-
ton, Bliss & Co. or by Lafitte & Co., but by persons with whom they
were unfortunately associated. I do not think plaintiffs intended or
consented to give possession until the money was paid. Under these
circumstances I do not see how, upon equitable principles, Morton, Bliss
& Co. and Lafitte & Co. can be permitted to save themselves from loss—
nay perhaps make a profit, at the expense of plaintiffs. It can not be
denied that under some form or other they were the associates of Price,
Hine & Tupper. Even if these three firms be treated not as commercial
partners, but as associates "*en participation*," (a contract however, which,
as I think, is not known to our law, unless it fall under the class of "special
commercial partnerships,") still we find that by the laws of France gov-
erning such associations the participants can not withdraw the assets of

the association to the prejudice of its creditors. They risk what they put in. See Troubat on Limited Partnership, p. 26, section 18.

Now that is precisely what Morton, Bliss & Co. and Lafitte & Co. have done or are seeking to do. Taking defendants' own view, these three firms associated themselves for a joint adventure in the purchase and sale of molasses. By every principle of right the money they put in or the property purchased with it, should be held to answer for debts contracted in the course of the business.

The judgment below was in favor of plaintiffs and against Jas. B. Lafitte & Co., and is correct, I think. I therefore dissent from the opinion of the court in this case.