152 So.2d 16

**Clark PENN**

v.

**Borris BURK, Mary Savarese, and M & M Home Repair Company.**

No. 46382.

March 25, 1963.

Rehearing Denied April 29, 1963.

Benjamin E. Smith, of Smith & Waltzer, New Orleans, for applicant.

Maurice R. Woulfe, Maurice L. Burk, New Orleans, for defendant-respondent.

HAMLIN, Justice.

Clark Penn is the owner of the premises designated as 2971 N. Dorgenois Street, New Orleans, Louisiana, which apparently belong to the community of acquets and gains existing between him and Mary Ross Penn, his wife. In 1960 these premises were in a state of disrepair and, according to Clark Penn's testimony, were going to be condemned by the City of New Orleans. During April, 1960, an outstanding mortgage with a balance of approximately $1,500.00 existed on the property and foreclosure proceedings had been instituted.

Mary Savarese, Operator of the M & M Home Repair Company, a building and home repair contracting business,[1] solicited the Penn Family by telephone and was informed by Anna Mae Penn (a daughter) that Mary Penn wanted her house repaired. Mary Savarese then personally called on Mary Penn, who described to her the repairs she desired and told her that she wanted two rooms added to the house. Shortly thereafter, Mary Penn signed at her home what she termed "a piece of

---

1. An affidavit, dated December 5, 1956, stating that Mrs. Mary Savarese is the sole proprietor of the M & M Home Re- pair Company, is recorded in the Conveyance Office of the Parish of Orleans.

paper" for Mary Savarese to go ahead and do the work.

This "piece of paper," headed "CONTRACT AND GUARANTEE," recited that for the sum of $12,000.00 M & M Home Repair Company agreed to:

" * * * take down drop shed in front, rebuild, tying into Main Roof. Also add 2 rooms across back of building 12 x 12—bath. New addition to be frame structure. Front addition is to be made into 2 rooms. 2 front doors, 2 windows in each rocm. 2 rooms on back is to have space made for 2 baths. 2 rear doors and 2 windows each. Screen in all of house, new and old. Sheet rock tape and paint new addition. Old house repair wall and paint. Install 2 hot water heaters customer has. Rewire house.

"Level up old house and straighten pillows, replace weather boards on old building and paint with 2 coats of paint. Put new windows frames in old building, also doors. Put new rafters sheeting on old building and new asbestos roof.

"4 sets of steps (concrete). 2 front sets and 2 rear sets.

"When complete we will have 6 room double."

There was a stipulation in the "CONTRACT AND GUARANTEE" that "Work not specifically listed will be extra. No plumbing, electrical, plastering, carpentry or painting, is included unless specifically listed. In raising jobs, M & M HOME REPAIR COMPANY will not be responsible for damage to plumbing, plastering or roofing or for any subsequent settlings."

The "CONTRACT AND GUARANTEE" stated that the $12,000.00 consideration was payable in cash, net, upon completion of the work; it further stated that to facilitate payment, the Owner authorized M & M Home Repair Company to obtain a loan for him through any source at payments of $120.00 per month for ——— months, with a mortgage, through a dependable source, according to the lender's terms, the monthly payments in either arrangement to include both principal and interest, with interest at ———% per annum and monthly payments to be based on a 10 year payout.

The document was signed by Mary Penn as Owner; it contained no acceptance by M & M Home Repair Company and was not dated.

The Penn property was examined by Borris Burk, a notary, attorney, and money lender. The date of this examination is not clear from the record, but Mrs. Savarese accompanied Burk when he made the examination; we infer that this took place before the Act of Mortgage, to be discussed infra, was passed.

Another "CONTRACT AND GUARANTEE," identical to the above, was later executed;[2] it recites that it was signed "this 19 day of April, 1960," and bears the signatures of Clark Penn and Mary Penn;[3] it also bears the acceptance for M & M Home Repair Company by M. Savarese, dated 4/19/60. Neither the first nor the second document was notarized or recorded.

The preponderance of the evidence is to the effect that this second document was signed by Clark Penn on May 5, 1960, at the office of Borris Burk, and that Mr. Burk, Mrs. Savarese, and Clark and Mary Penn and their daughter, Dorothy Brown, were present; there is testimony to the effect that the document was ready for signature when Clark Penn went to Burk's office. The preponderance of the evidence is also to the effect that Clark Penn never signed anything at his home.

On May 5, 1960, Clark Penn signed an Act of Mortgage before Borris Burk, Notary Public, whereby he acknowledged that "he is justly and truly indebted unto Cyril F. Dumaine in the full and true sum of TWELVE THOUSAND AND NO/100 DOLLARS ($12,000.00) borrowed money, which the said Cyril F. Dumaine has this day loaned and advanced to mortgagor and for the reimbursement whereof said mortgagor has made and subscribed his one certain Promissory Note for the sum of ($12,000.00) to the order of BEARER * * * payable * * * in monthly installments of ONE HUNDRED TWENTY AND NO/100 DOLLARS ($120.00) each, beginning one month after date until paid in full with interest thereon at the rate of eight per cent, per annum from date, payable annually until paid, * * *." The mortgage was given on the property herein involved, and the Act contained an exception which stated that there was an existing mortgage on the property which would be paid "with the proceeds of this mortgage and cancelled." The Act of Mortgage was recorded on May 5, 1960. We find from the record that Cyril F. Dumaine, who also signed the Act of Mortgage, was only a nominal party.

The preponderance of the evidence is to the effect that the Act of Mortgage was shown to Clark Penn by Borris Burk, and that Clark Penn signed the $12,000.00 Bearer Note and the Act of Mortgage simultaneously with his signing of the second "CONTRACT AND GUARANTEE" for

---

2. The work which M & M Home Repair Company agreed to perform was set forth on the reverse side of the documents. The document signed by Mary Penn was written in original type; at the head of the document, the name of owner is set forth in original type as Mr. and Mrs. Clark Penn. On the document signed by Mary Penn and Clark Penn, the name of owner and the agreed work to be done are set forth in typewriter carbon.

3. Mary Penn denied that she signed the second document.

the repair of and addition to the premises 2971 N. Dorgenois Street. The evidence of record is affirmative that no money nor check was given to Clark Penn on May 5, 1960, or at any other time; it is also affirmative that neither money nor check was given to Mrs. Savarese in Borris Burk's office on May 5, 1960. In other words, no one received any money on May 5, 1960.

The work commenced on the premises herein involved shortly after May 5, 1960, and payments were made for the account of Clark Penn on the note, supra.

When payments on the note ceased, Borris Burk instituted proceedings for an order of executory process (filed January 13, 1961), praying that a writ of seizure and sale issue against the property. Burk alleged, among other things, that he was the holder and owner for valuable consideration before maturity of a certain promissory mortgage note made and subscribed by Clark Penn, payable to the order of Bearer in the sum of $12,000.00 dated at New Orleans, Louisiana, May 5, 1960.

A writ of executory process and seizure issued as prayed for.

On February 10, 1961, Clark Penn brought proceedings to enjoin the execution of the writ of executory process and seizure; he named Borris Burk, Mary Savarese, and M & M Home Repair Company as defendants. In his petition he alleged in part that:

"Your petitioner is informed and believes, and on the basis of such information and belief, alleges that Mary Savarese and Borris Burk, both and together, are either partners or own interests in the M & M Home Repair Company, and that they conspired together to defraud your petitioner out of his home." Article XI.

"That besides informing your petitioner that they had paid off the existing first mortgage that was on the property, your petitioner was given no accounting of or information relating to the disbursement of the alleged Twelve Thousand and No/100 ($12,000.00) Dollar loan under the note and mortgage allegedly signed." Article XII.

" * * * your petitioner alleges that the work was either not performed or performed in an unworkmanlike, careless and negligent manner, actually causing the property to depreciate and to deteriorate, the property presently being less valuable because of said attempted repairs than it was previous to their commencement; that the said repairs, in addition to being generally, carelessly, negligently and unartfully done and carried out in an unworkmanlike manner, consisted partially but not exclusively of the following defects:

"a. The wiring was improperly done;

"b. The house has been upset and not leveled and is hanging in the middle;

"c. The center pillar foundations are falling down, not having been properly erected;

"d. Sheetrock installation has cracked due to faulty workmanship and installation;

"e. The roof and back porch of the house which were to have been completed have not been so completed;

"f. Baseboards have not been installed as required;

"g. Flooring required to be laid has not been so provided;

"h. Locks called for in the contract have not been installed;

"i. Doors are not properly hung;

"j. Walls are out of plumb;

"k. Remainder of foundation is improperly installed and absolutely unsafe, being composed of scrap and rubble and used bricks, all unmortared, along with asbestos shingles stacked one on top of the other;

"l. Bathroom fixtures not installed, causing tenants to vacate the premises and subsequent loss of rent at the rate of $75.00 per

month since May of 1960." Article XIII.

" * * * that this court should appoint an impartial expert contractor and appraiser to examine the said contract attached hereto and to examine and appraise the premises purported to be repaired thereunder and to report back to this court upon the performance of said contract and the condition of said premises, including the value thereof; that the fees of such expert should be taxed as costs in this proceeding." Article XV.

" * * * that petitioner should have judgment against the defendants, jointly, severally and in solido, in the full amount of Twelve Thousand and No/100 ($12,000.00) Dollars, for damages occasioned by the said failure of the said Borris Burk and the M & M Home Repair Company to complete their contractual obligations under the aforesaid contract; * * *." Article XVI.

" * * * under the provisions of La.C.C. 2924, the note which your petitioner signed and on which he is sued upon by Borris Burk contains usurious interest in that Borris Burk, who, in fact, was the real mortgagee, loaned far less than Twelve Thousand and No/100 ($12,000.00) Dollars to petitioner for the repair of his house, the exact

amount being only known to Borris Burk, Mary Savarese and the M & M Home Repair Company; and the difference between the amount actually paid out and the Twelve Thousand * * *, the amount of the note, was a bonus paid for lending the money to finance M & M's repairs of petitioner's house, which is a form of discount, in addition to which the note sued upon * * * carries with it '* * * interest thereon at the rate of eight per cent, per annum from date, payable annually until paid * '* *', and this in effect is interest on interest which is usurious and contra bonos mores, therefore, cannot be sued on for collection with execution against petitioner's property." Article XVII.

Plaintiff prayed for a temporary restraining order and that there issue a rule nisi, ordering Borris Burk and the Civil Sheriff for the Parish of Orleans to show cause why a preliminary and, subsequently, a permanent injunction should not issue, enjoining, after the posting of good and solvent surety, the execution of the writ of executory process and seizure against his property. He further prayed that there be judgment against all three defendants, jointly, severally and in solido, for damages in the sum of $12,000.00 and attorney's fees in the amount of $2,500.00. Among other demands, he prayed for cancellation of the instant mortgage existing on his property.

The trial court issued the rule nisi for a preliminary injunction, and evidence was heard.

In his reasons for judgment the trial judge stated that trial on the rule nisi was for a preliminary injunction, but that the parties had stipulated that the trial would be on the merits and that if the court decided to issue an injunction it should be a permanent one. We have been unable to find such a stipulation in the record; the defendant Burk urged in the Court of Appeal that such a stipulation had not been made.

The trial court found that a very close business relationship existed between Mrs. Mary Savarese and Borris Burk; that insofar as home repair work was concerned, they were close business associates, their business affairs being closely intertwined. It concluded that the business relationship which existed between them filled all codal requirements for partnerships, citing Articles 2801, 2805, 2811 and 2813 of the LSA–Civil Code.

The trial court further found that the defendants did not substantially perform the contract (it believed that the facts showed there was complete failure of cause or consideration), and that it was therefore unenforceable and void. From the evidence adduced the court found that the defendants never did intend to substantially comply with the contract, and that therefore under

Article 1847 of the LSA–Civil Code the contract was void on the ground of fraud.

With respect to the mortgage that already existed on the property when Clark Penn signed the instant note and incurred the instant mortgage, the trial court found that Borris Burk did prove that he paid a note which was standing in the name of plaintiff in the amount of $1,658.94.

The judgment of the trial court ordered that the rule nisi be made absolute and that a permanent writ of injunction issue enjoining, restraining and prohibiting the Civil Sheriff for the Parish of Orleans from proceeding further in the executory process instituted and ordered in proceeding No. 387–351 of the Civil District Court for the Parish of Orleans, entitled Borris Burk vs. Clark Penn; it further ordered Borris Burk to pay plaintiff's attorney's fees in the amount of $500.00, and all costs of court and the fee of the expert. Defendant Borris Burk was awarded judgment in the sum of $1,658.94 with legal interest from February 10, 1961 until paid.

On appeal to the Court of Appeal, Fourth Circuit, (145 So.2d 106) that court found that the record was devoid of any evidence to prove the existence of a contract of partnership or sharing in any proportion in the profits and/or losses. It concluded that Borris Burk made a loan in good faith to finance the alterations and repairs to plaintiff's home and was a bona fide holder of

the note executed by plaintiff on May 5, 1960. It further concluded that there was a partial failure of consideration to the extent of $1,541.06 and that, while defendant Burk was entitled to proceed with the executory process, he could only collect the amount which he had actually paid to or for the account of plaintiff.

The Court of Appeal reversed and set aside the judgment of the trial court; it then ordered that the principal sum due defendant Borris Burk on the note executed by Clark Penn on May 5, 1960, be fixed at the sum of $10,458.94, plus interest and attorney's fees, and it enjoined Borris Burk and the Civil District Sheriff for the Parish of Orleans from collecting more than that amount in the executory process instituted and ordered in the Civil District Court for the Parish of Orleans.

Insofar as plaintiff's demand for damages and attorney's fees for the alleged failure of M & M Home Repair Company to fulfill the contract for the repair of plaintiff's home was concerned, the Court of Appeal remanded the cause for trial in accordance with law and consistent with the views it had expressed.

In the exercise of our supervisory jurisdiction (Art. VII, Sec. 11, LSA–Const. of 1921), we directed Certiorari to the Court of Appeal, Fourth Circuit, in order that we might review the above judgment.

Clark Penn assigns the following errors to the judgment of the Court of Appeal:

"1) The Court of Appeal erred in finding the record devoid of any evidence that Savarese and Burk were partners or engaged in a joint venture.

"2) The Court of Appeal erred in not finding a substantial failure of performance on the part of Burk.

"3) The Court of Appeal erred in not finding that Burk, because of substantial non-performance, was not entitled to recover under his mortgage and note as well as under the contract.

"4) The Court of Appeals erred in not striking down the usurious interest charged by Burk.

"5) The Court of Appeal erred in not finding that Burk by failing to inform and account to his borrower became liable for that and a further breach of his fiduciary duty to inspect and to require a workmanlike job when he purchased for them and/or furnished them a substandard construction.

"6) The Court of Appeal erred in not finding that the record disclosed that Burk and Savarese shared profits and that Burk agreed to assume losses.

"7) The Court of Appeal erred in not finding the note and mortgage to have been novated or merged into the building contract when Burk took his profits from the sum loaned to finance it.

"8) The Court of Appeal erred in not finding Burk an undisclosed principal and Savarese his agent-employee in the building contract."

█ Initially, we must determine whether or not a partnership or joint adventure relationship existed between Borris Burk and Mary Savarese. We must also determine whether parol evidence was admissible to prove failure of consideration. In answer to Clark Penn's petition for injunction, Borris Burk averred:

"* * * defendant alleges that the money for the mortgage was furnished by Mrs. Eleanor G. Guidry, who is the actual owner of the mortgage note; that the foreclosure proceedings were instituted in the name of defendant Borris Burk for the convenience and accommodation of the real owner of the note, Mrs. Eleanor G. Guidry, and at her request; that the said Mrs. Guidry held the note in her possession and turned it over to defendant only for the purpose of instituting foreclosure proceedings; and that defendant never at any time owned said mortgage note."

On the basis of the above recitations, Borris Burk contends that he was a nominee for Mrs. Guidry and that parol evidence was improperly admitted in an attempt to establish failure of consideration. LSA–R.S. 7:51.[4] Admitted in evidence is a check of May 2, 1960, made payable to Borris Burk, Notary Public, in the amount of $11,000.00, signed by Mrs. Eleanor Guidry; evidence of record is to the effect that Borris Burk discounted with Mrs. Guidry for $11,000.00 the $12,000.00 Bearer Note signed by Clark Penn, and that he cashed Mrs. Guidry's check and used the proceeds in part for the transaction herein involved. However, Borris Burk did not amend his pleadings, supra, wherein he alleged that he was the holder and owner of the instant note; therefore, he cannot now deny such fact. LSA–C.C. Art. 2291; Prieto Lumber Company v. Shoultz, La. App., 111 So.2d 857.

We find, as did the Court of Appeal, that Borris Burk is the holder of the note, and, that Clark Penn is entitled to set up any defense which he might have against Borris Burk; failure of consideration would constitute a defense. LSA–R.S. 7:28; Davis v. Davis, La.App., 50 So.2d 647; Carreras v. Hollister's Heirs, La. App., 197 So. 815; In re Keller's Estate, La.App., 24 So.2d 833.[5]

The testimony of Borris Burk is to the effect that he represented persons who had money to lend; that the loans were employed on contracting jobs such as the instant one, and he checked to see that the work was performed satisfactorily in the interest of the persons who had loaned money; that if the workmen were to record liens against the property, he would satisfy them because of his guarantee to the persons who loaned him money.

With respect to Mrs. Savarese's method of financing, Burk said, "I don't know whether she goes to anybody first or comes to me last, I don't know, but she comes to me and she tells me the job and where the property is. I go down there to take a look at it, and if I think after the work is done that the property will be worth the amount of money I try to place it with some of my clients who lend the money. If they do lend the money I pass the act of

---

4. "The holder of a negotiable instrument may sue thereon in his own name; and payment to him in due course discharges the instrument."
5. Borris Burk relies on this case as authority for his contentions; it is authority, however, for the view that where an attempt is made to enjoin foreclosure proceedings on a note secured by authentic act, and the attempt to enjoin is based on the charge that there was no original consideration for the note, parol evidence is not admissible unless there is a charge of fraud or error. The case, however, holds that where it is conceded that there was consideration when a note was given, subsequent failure of consideration may be shown by parol, since this is not necessarily a contradiction of terms of the note or of the authentic act.

mortgage and then I pay the money to her as we go along, but we're not in partnership whatsoever." He explained, "Well, let me explain, try to explain something to you. Mrs. Savarese doesn't have no checking account so she cashes the check. She goes from my office; comes to my office; she picks up the checks and goes from my office and goes to the bank, which is in the next block, and every one is OK'd, the signature, so she can go in and cash it. Everything is written on account of job, account of job number right on every one and receipts for cash money on account of jobs, and receipts come about like that. Sometimes she will call up, say she needs some money in a hurry, some cash money; it's late to get to the bank to give her a check to cash, so she will come up to my house, and I have money and I give her in cash money and I get a receipt what job it is and I keep it; when the job is finished I throw away the record."

Burk admitted that he did quite a bit of financing business with Mrs. Savarese. He said that in this instance he withheld $1,-000.00 from the $11,000.00 for a prior debt Mrs. Savarese owed him, and that he reserved a fee of approximately $500.00 for himself; he also reserved some money to pay sub-contractors and did pay one of them.

Pertinent testimony of Burk is as follows:

"Q. You went down there before the work started and you looked over the job?

"A. I looked over it.

"Q. And talked with the people about what needed to be done. Isn't that right?

"A. No. Don't put words in my mouth. I'll tell you how it was done. I come down there and I take a look at the building, and I take a look at the work that was going to be done; I see after it's been done whether the building will be worth the money that I'm supposed to loan money on, and I thought it would be worth, I just think the property will be worth $12,000.00 after the work is done.

"Q. Since that time you haven't set foot in that building?

"A. No, not yet.

"Q. So you don't know whether the work was done properly or not, do you?

"A. I'm not supposed to. I'll find out later on.

"Q. But you paid the money out, didn't you?

"A. That's right, had to do work as we went along.

"Q. You say you had responsibility, but yet you didn't inspect that building before you paid out the money?

"A. My responsibility is to get the men to lend the money. As far as they're concerned they're not going to lose anything. If I have to pay out of my pocket they'll get paid. They have enough confidence in me."

Burk's testimony, in his attempt to explain what was expended on the $12,000.00 contract, is confusing. However, it is explicit to the effect that he discounted the $12,000.00 note for $11,000.00, that he set the interest at 8%, that he retained $1,000.-00 for a debt Mrs. Savarese previously owed him, and that he charged approximately $500.00 for unitemized attorney fees, notarial costs, and expenses of recordation.

When Burk was asked whether he gave the Penns an accounting, he answered negatively and explained as follows:

"A. You see, a contractor knows that they're dealing with a class of people and what you call kind of work building. She could not get any loan from any homestead or anywhere else, and private individual is taking awful chance on those things, and only time they make a loan if they have a discount note. So the contractor knows about it; contractor figures her work or his work and adds a certain amount of a discount. Now when they came around to me to talk about it we checked it up and found out it was foreclosed. We had idea about how much we have to pay for the mortgage. So I told them my services will have to be Five Hundred Dollars at least with the expenses[6] and we added up the discount and her work and the amount to pay, and she went back and made them sign up a contract for Twelve Thousand Dollars; and that was how it worked. When she brought me back a contract for Twelve Thousand Dollars I started to work on it, and I got somebody to lend the money."

The testimony of Mrs. Savarese is vague and confusing. Her testimony, as far as we are able to determine, is to the effect that in the beginning of her negotiations with the Penns she gave them a price of $9,800.00, and that this price consisted of $8,800.00 for labor and material and an additional $1,000.00; she never did affirmatively state what this additional $1,000.00

---

6. Burk had just previously stated that he did not tell the Penns anything about charging them this $500.00.

was to represent. She then testified that, "when we found out that they had a mortgage after making oh three or four different attempts to get someone to finance the property; it was such a bad shape. Then I presented the amount of work that was to be done to Mr. Burk with notation of I think it's a title certificate. Well, when we examined the title they came up with a mortgage having been recorded and a foreclosure proceeding. So we go back and I explained that to Mrs. Penn, not Mr. Penn. I explained that to Mrs. Penn and her daughters that it would have to be paid off, and she told me yes, that they had gotten some plumbing work done for Eight or Nine Hundred Dollars, and the note read Fifteen Hundred. So then we provided for that into the contract, which is the usual procedure." Mrs. Savarese said that the payment of the existing mortgage was an inducement for signing the contract; that she did not make arrangements for the amount of 8% interest. She said that the Penns did not ask for an accounting and she did not give them a written statement of the charges that would be made; that giving an accounting was not her usual procedure. Her testimony reflects that her method of keeping records was unbusinesslike and inadequate.

The gist of Mrs. Savarese's testimony is to the effect that she secured the instant contract and saw to the performance of the work that was done, paying for labor and material with money advanced to her intermittently by Mr. Burk; that Mr. Burk made all financial arrangements and took care of all legal matters. She admitted that she had owed Mr. Burk $1,000.00 for money advanced to her when she was injured in 1959.

Mrs. Savarese further stated that she had worked on Burk's own properties—had built a couple of houses for him, and on one occasion had repaired and renovated a house for him. Pertinent testimony is as follows:

"Q. How many homes would you say you either repaired or built through Mr. Burk's financing in the last five years?

"A. Well, now, that would be hard for me to answer.

"Q. Well, in the last year?

"A. Let's see, and again that would be hard to answer. I'd have to go home and check.

"Q. Would it be many?

"A. Let's put it this way, Your Honor. I think it would be five or six at least.

"Q. In the last year?

"A. Yes.

"Q. How many were you working on during 1960, the year that this

work was done? That would take in the five or six I suppose, huh?

"A. Yes, it would."

Anna Mae Penn testified that Mrs. Savarese and Mr. Burk visited the Penn premises before the work started and that Mr. Burk had said he wanted to see what he was putting his money out on; that Mr. Burk came back with Mrs. Savarese, but he never did get out of the station wagon. She further testified that payments on the note—she considered them rent—were at times made to Mrs. Savarese who gave receipts on little pieces of paper.[7]

The law with respect to joint adventures and partnerships must be applied to the above facts, in order to determine what business relationship existed between Burk and Mrs. Savarese, who was not a party to the injunction suit.

Partnership is a synallagmatic and commutative contract made between two or more persons for the mutual participation in the profits which may accrue from property, credit, skill or industry. LSA–C.C. Art. 2801.

"Partnerships, declares Civil Code, Article 2805, must be created by the consent of the parties. The jurisprudence dealing with this codal provision holds that the real intention of the parties is to be ascertained in determining the question of partnership vel non. In this connection the Supreme Court in Chaffraix & Agar v. John B. Lafitte & Company, 30 La.Ann. 631, said: 'The true, final, satisfactory, conclusive test is in the answer to the question: What was the real meaning and intention of the parties, as expressed in their contract, whether verbal or written? If they intended to create a partnership, they will be treated as partners inter sese and with respect to third persons: If they did not intend to create that relation, but merely to divide the profits, or to share profits and losses, in a speculation or adventure, they will not be partners inter sese, nor will they be liable as such. Those who hold themselves out to the public as partners, or knowingly permit themselves to be so held out, may not, indeed, be actually partners, if they have not so intended and agreed; but they will be subject to the same liabilities as partners to those who have dealt and given credit on the faith and in consequence of such acts.' " Reel v. Brewer, La.App., 6 So.2d 99.

■ Partnership is a special contract, dependent for its creation upon the con-

---

7. Mrs. Savarese admitted that she made collections on the note from the Penns, giving them separate receipts; she also admitted that she had a receipt book in her possession. (This receipt book, admitted in evidence, shows two payments of $120.00 each.)

sent of the parties (LSA–C.C. Art. 2805) that that particular relation should be established between them. Collom v. Bruning, 49 La.Ann. 1257, 22 So. 744; Glover v. Mayer, 209 La. 599, 25 So.2d 242; Stovall v. Solomon, La.App., 94 So.2d 551.

The real question is whether as between the parties, there was an intention to establish a partnership. Labat v. Labat, 232 La. 627, 95 So.2d 129.

"A pre-requisite to creation of a partnership or joint venture between the parties is an intent by the parties that the business relationship between them shall have the characteristics of a partnership. LSA–C.C. Art. 2805; Johnson v. Johnson, 235 La. 226, 103 So.2d 263; * * *." Walker v. Delahoussaye, La.App., 116 So.2d 884.

"Joint adventure, as a legal concept, is of comparatively recent origin, and is the creature of American courts. 33 C.J. p. 841. The concept has received some recognition in this state. Ludeau v. Avoyelles Cotton Co., Inc., 164 La. 275, 113 So. 846; Doane v. Adams & Co., 15 La.Ann. 350.

"'A joint adventure has been aptly defined as a special combination of two or more persons, where in some specific venture a profit is jointly sought without any actual partnership or corporate designation.' 33 C.J. p. 841. A joint adventure has also been defined as 'An

association of two or more persons to carry out a single business enterprise for profit.' Fletcher v. Fletcher, 206 Mich. 153, 172 N.W. 436, 440. * * * The relations between joint adventures are assimilated to those of partners inter se. Ludeau v. Avoyelles Cotton Co., supra. As respects the character of the business undertaken, the principal difference between a partnership and a joint adventure 'is that, while a copartnership is ordinarily formed for the transaction of a general business of a particular kind, a joint adventure is usually, but not necessarily, limited to a single transaction, although the business of conducting it to a successful termination may continue for a number of years.'" Daily States Pub. Co. v. Uhalt, 169 La. 893, 126 So. 228.

"As between the parties, joint adventures arise only where the parties intended the relationship to exist. They are ultimately predicated upon contract either express or implied. Daspit v. Sinclair Refining Co., 199 La. 441, 6 So.2d 341. Likewise, there must be an equal right to direct and govern the movements and conduct of each other in respect to the undertaking, and each party must have some voice and right to be heard, in the control or management. Hawkins v. Travelers Indemnity Co., La.App., 73 So.2d 348." Pillsbury

Mills v. Chehardy, 231 La. 111, 90 So. 2d 797.

"Liability for the obligations created by or arising from a joint adventure as between the participants inter se, is to be determined from the character of the business or undertaking engaged in." Young v. Reed, La.App., 192 So. 780. See, Hawkins v. Travelers Indemnity Co., La.App., 73 So.2d 348.

The testimony of Borris Burk and Mrs. Savarese (narrated and quoted supra) discloses an intent between the parties to work together on the instant project; their consent was mutual. Borris Burk's testimony reveals that he was more than a money lender; Mrs. Savarese's testimony confirms this fact. The testimony reflects an intent to share the profits; Burk withheld an unitemized $500.00 from the discount of the note for himself and also withheld $1,000.00 for the payment of a debt Mrs. Savarese owed him. With respect to losses, Burk testified that he would bear any loss that might be incurred by those who entrusted him with their money; that he would satisfy any lien that might be placed on the property involved. Both Burk and Mrs. Savarese exercised control; Mrs. Savarese directed the physical work which was observed by Burk on at least one occasion, and Burk handled the financial arrangements to the point of intricate detail.

The law cited and quoted supra sets forth that the duties and responsibilities of joint adventurers and partners are similar. We conclude, therefore, that insofar as the additions to and the repair of the premises 2971 No. Dorgenois Street, New Orleans, Louisiana, are concerned, a contract of partnership or joint adventure existed between Borris Burk and Mary Savarese.[8] Any failure of consideration attributable to one of the parties is attributable to the other.

The evidence of record definitely discloses a partial failure of consideration; the condition of the record makes the amount of such failure indeterminate.

D. R. Smart, a builder contractor, testified that the value of the work done was approximately $3,500.00.

J. A. Haase, Sr., President of Haase Construction Company, Inc., (appointed by the trial court to make findings with respect to the instant work) submitted the following first report:

"1. My estimate of the costs of materials, subcontractors, and permit used in the job contracted for ------- $4,759.00

"2. Cost of labor on the job --- 3,236.00

$7,995.00

"3. About fifty (50%) percent of the work performed was

---

8. Mary Savarese is admittedly the sole proprietor of M & M Home Repair Company, named as a defendant herein.

done in a workmanlike manner and up to the required standards.

"4. In my opinion the contractor did not substantially perform the work set forth in the specifications."

Mr. Haase submitted two other reports showing the unworkmanlike character of the work performed on the instant property, and estimated what would be necessary to place the work performed in workmanlike condition. He testified at length with respect to his reports and confirmed the findings set forth therein.

Several workmen testified as to the workmanlike manner in which they performed their labors; their testimony bears no weight as to the value of the work performed.

Elvy Nelson, Building Inspector for the City of New Orleans, testified that he inspected the instant property; that under the permit, everything was in order; that he did notice a sag in the middle of the premises, but that Mrs. Savarese had agreed to take care of it. He said, however, that there were no plans submitted, and that his interest was to see that there was a conformity to structural requirements. The permit under which Mr. Nelson was inspecting called for approximately $6,000.00 worth of work.

Albert G. Bear, an architect and civil engineer whose work was primarily that of drafting specifications, testified that the work was done in conformity with the contract; that the enhancement should be at least equal to what he estimated the cost of the property, namely, $8,920.00.

There is no affirmative proof as to the value of the work performed and the amounts actually expended on the repairs and additions; nor is there affirmative proof as to the amount required to place the premises in the workmanlike condition contracted for by Clark Penn and agreed to by Mrs. Savarese, and of the damages and attorney's fees demanded by plaintiff for the failure of Mrs. Savarese to fulfill the contract for the repair of plaintiff's home. LSA–C.C. Art. 2769. These issues, the question of usury urged by plaintiff, and all other issues, will have to be heard on the merits, inasmuch as there has not been a trial on the merits.

There is no affirmative proof as to the exact amount paid by Clark Penn or paid for his account on the instant mortgage. There is only affirmative proof that Borris Burk paid the amount of $1,658.94 to Alphonse Mortgage Company to pay off the mortgage existing on the premises at the time Clark and Mary Penn signed the documents herein involved.[9] We, therefore,

9. The Court of Appeal correctly stated, "Where the holder of a note seeks to col-

lect more than the sum due him, the remedy of the defendant in an executory

conclude that there is presently a partial failure of consideration to the extent of $10,341.06, and that the defendant, Borris Burk, is entitled to proceed with the executory process for the amount of $1,658.94.

■ The Court of Appeal, Fourth Circuit, (145 So.2d 106) observed that a permanent writ of injunction was issued by the trial court; this observation is correct. However, as heretofore stated, the record fails to disclose a stipulation that the trial would be on the merits and that if the trial court decided to issue an injunction it would be a permanent one; the trial court was therefore in error in issuing a permanent injunction. See, No. 388–188 of the Civil District Court for the Parish of Orleans; LSA–C.C.P. Art. 3606; Ridge Park v. Police Jury of Jefferson Parish, 210 La. 351, 27 So.2d 128. Cf. Warren v. De Armas, 236 La. 272, 107 So.2d 638; Westside Transit Lines v. New Orleans Public Service, La.App., 135 So.2d 278; Alphonse Mortgage Company v. Saucier, La.App., 138 So. 2d 849.

Accordingly, the judgment of the Court of Appeal, Fourth Circuit, is set aside; and

proceeding to is to prevent the collection of the excess by injunction, not to stop the sale absolutely. Spiro v. Reynaud, 240 La. 192, 121 So.2d 741; Whitney-

It is now Ordered, Adjudged and Decreed that the principal sum due defendant, Borris Burk, on the note executed by plaintiff, Clark Penn, on May 5, 1960, be and it is hereby fixed at the sum of $1,658.94, plus interest and attorney's fees; it is further ordered that a preliminary injunction issue herein upon Clark Penn furnishing security in the sum of $500.00 (LSA–C.C.P. Art. 2754), preliminarily enjoining and restraining the defendants, Borris Burk and the Civil Sheriff for the Parish of Orleans, from collecting more than this amount in the executory process instituted and ordered in the proceeding entitled Borris Burk v. Clark Penn, No. 387–351 of the Docket of the Civil District Court for the Parish of Orleans. All other demands to be tried on the merits of the case.

Costs of the instant proceedings are cast equally against plaintiff, Clark Penn, and defendant, Borris Burk. All other costs are to await the final determination of this cause.

HAMITER and SANDERS, JJ., concur in result.

Central Trust & Savings Bank v. Sinnott, 135 La. 785, 66 So. 222; Sample v. Elliott, 155 La. 941, 99 So. 705."